**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF MARYLAND**
**(Greenbelt Division)**

| | |
|---|---|
| **In re:** | ) |
| | ) Case No. 11-33377-TJC |
| **ERNESTINE C.J. GREEN,** | ) Chapter 13 |
| | ) |
| Debtor | ) |
| _____ | ) |

**ORDER APPROVING SETTLEMENT BETWEEN THE**
**UNITED STATES TRUSTEE PROGRAM AND WELLS FARGO BANK, N.A.**

**RECITALS**

Whereas, on November 30, 2011, Ernestine C.J. Green (the "Debtor") filed a chapter 13 bankruptcy petition in the United States Bankruptcy Court for the District of Maryland, commencing this case (the "Green Case").

Whereas, on March 12, 2012, Wells Fargo Bank, N.A. ("Wells Fargo") filed a proof of claim in the Green Case asserting a secured claim in the amount of $178,243.40 arising in connection with a Note and Deed of Trust dated October 25, 2005 (the "Proof of Claim") (Claims Register for Case No. 11-33377, Claim No. 3).

Whereas, the property subject to Wells Fargo's secured claim asserted in the Proof of Claim, 32 Joyceton Terrace, Upper Marlboro, Maryland 20774, is the debtor's principal residence.

Whereas, documentation attached to the Proof of Claim asserted that the Debtor's monthly payment amount was $1,387.56.

Whereas, Wells Fargo first filed a notice of payment change in the Green Case on December 16, 2014, asserting an increase in the Debtor's monthly payment due to a change in

1

escrow, and establishing a new monthly payment amount of $1,413.33 with an effective date of January 1, 2015 (the "2014 PCN") (Claims Register for Case No. 11-33377, Claim No. 3).

Whereas, the escrow documentation attached in support of the 2014 PCN reflects an escrow analysis date of January 14, 2014, more than ten months prior to the filing of the 2014 PCN, and also states that the effective date of the Debtor's monthly payment increase is March 15, 2014, more than nine months prior to the filing of the 2014 PCN.

Whereas, the escrow documentation attached in support of the 2014 PCN further states that the Debtor's current monthly payment amount is $1,381.50, which is inconsistent with the $1,387.56 monthly payment amount set forth in the Proof of Claim filed in 2012.

Whereas, prior to the filing of the 2014 PCN, the Debtor's monthly payment amount changed one or more times due to changes in escrow, but Wells Fargo failed to file a notice of payment change.

Whereas, in addition to failing to timely file one or more PCNs[1] in the Green Case, Wells Fargo failed to file or untimely filed PCNs in other Bankruptcy Cases pending in the District of Maryland and other Districts nationwide.[2]

Whereas, the Executive Office for United States Trustees (the "EOUST") approached Wells Fargo Bank, N.A. ("Wells Fargo") with concerns regarding the timeliness of filing and the failure to file PCNs required under Bankruptcy Rule 3002.1.

Whereas, Wells Fargo confirmed systemic issues with the filing of PCNs, as well as systemic issues related to the preparation of annual escrow analyses for borrowers in Bankruptcy Cases, and the proper application of escrow shortage payments.

Whereas, Wells Fargo has entered into discussions with the EOUST to resolve these issues.

Whereas, as a result of their discussions, the parties have reached an agreement as set forth in this Order (the "Order"), subject to the final approval of the Court.

Now therefore, in consideration of the foregoing, and of the mutual promises and compromises between them, the EOUST and the United States Trustees and Acting United States Trustees for Regions 1 through 21 (collectively "the United States Trustee Program" or "USTP"), and Wells Fargo (Wells Fargo and USTP are collectively referred to herein as the "Parties") do hereby agree, stipulate and consent as follows, subject to the Court's entry of this Order and the passage of any applicable appeal period.

---

[1] Capitalized terms not otherwise defined herein shall have the meanings assigned to them in the relevant portion of the Order.

[2] Additional examples of chapter 13 cases in which Wells Fargo untimely filed or failed to file PCNs pending in this District include: *In re Smith,* Case No. 11-15123-TJC, *In re Pegram,* Case No. 11-30095-WL, *In re White*, Case No. 13-27096-PM.

# ARTICLE I

## JURISDICTION AND VENUE

This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding under 28 U.S.C. § 157(b)(2). Venue in the United States Bankruptcy Court for the District of Maryland is proper pursuant to 28 U.S.C. § 1409(a).

# ARTICLE II

## DEFINITIONS

"Active Account" shall mean or refer to an account: (1) as to which one or more of the borrowers has been a debtor in a Bankruptcy Case that was pending at any time during the Relevant Period, regardless of the current status of the Bankruptcy Case; and (2) that has not been foreclosed upon, been subject to short sale, or paid in full as of the effective date of this Order.

"Bankruptcy Case" shall mean or refer to a case filed under chapter 13 of the United States Bankruptcy Code.

"Covered Conduct" shall mean and include:

1. The timeliness of PCNs filed during the Relevant Period;

2. The lack of filing of required PCNs during the Relevant Period;

3. The adequacy of Wells Fargo's policies and procedures concerning the necessity of filing and the timeliness of filing PCNs during the Relevant Period; and

4. The timeliness of preparing and communicating Escrow Analyses to borrowers in Bankruptcy Cases during the Relevant Period.

"Daily Simple Interest" shall mean a method of calculating the interest charge on a loan, which is determined by multiplying the daily interest rate by the principal by the number of days in the period. The amount of interest charged during any one period depends on the number of days in the period.

"Escrow Analysis" shall mean the annual escrow analysis for borrowers in Bankruptcy Cases with an escrow account that is required to be prepared and communicated pursuant to applicable non-bankruptcy law.

"Lines of Credit" shall mean an established maximum loan balance that the customer can borrow at any time. The amount of the monthly payment is usually calculated as a percentage of the balance owed during the period.

2

"Loan Modifications" shall mean an agreement to change existing loan terms in response to a borrower's long-term inability to repay the loan. Loan modifications typically involve a trial payment plan followed by a reduction of the interest rate, an extension of the length of the loan, a change in the type of loan, e.g. adjustable rate to fixed rate, or any combination.

"Missed PCNs" are changes in the amount of a payment for Active Accounts that required the filing of a PCN during the Relevant Period but for which the PCN was not filed.

"MSP" shall mean the mortgage servicing platform Wells Fargo used during the Relevant Period and continues to use to service the vast majority of its consumer home lending portfolio.

"PCN" shall mean the notice of any change in the payment amount required to be filed and served pursuant to Bankruptcy Rule 3002.1.

"Properly Filed PCN" shall mean a PCN that is: (1) timely filed with the bankruptcy court that provides the borrower with the correct payment change amount and the correct date that the new payment change will go into effect; and (2) otherwise accurate and in compliance with the requirements of the Bankruptcy Code and Federal Rules of Bankruptcy Procedure.

"Relevant Period" shall mean the time period between December 1, 2011 and March 31, 2015.

"Untimely Escrow Analyses" shall mean Escrow Analyses required on Active Accounts that during the Relevant Period were not completed and communicated as required under applicable bankruptcy and non-bankruptcy law within a 12 month time period.

"Untimely PCNs" are PCNs filed with bankruptcy courts for Active Accounts: (1) during the Relevant Period; and (2) less than twenty-one (21) days before a payment in the new amount was due or after the effective date of the new payment amount.

## ARTICLE III

## FACTS AS THEY RELATE TO PCNS

Without waiving any privilege, Wells Fargo represents that the following facts are accurate to the best of its knowledge and belief:

### Accuracy and Signing Process Associated With Filing PCNs

1.      Bankruptcy Rule 3002.1(b) requires a holder of a claim secured by a security interest in the debtor's principal residence, which claim is provided for in the debtor's plan under Bankruptcy Rule 1322(b)(5), to file and serve on the debtor, debtor's counsel, and the trustee a notice of any change in the payment amount, including any change that results from an interest rate or escrow account adjustment, no later than 21 days before a payment in the new amount is due. Bankruptcy Rule 3002.1(d) requires that the PCN must be prepared as prescribed by the appropriate Official Form, and filed as a supplement to the holder's proof of claim. Pursuant to these rules, Wells Fargo developed processes to ensure that the information contained on each PCN is accurate, and that the PCN is reviewed and signed by the individual who reviewed the

3

accuracy of the information contained in the PCN. As such, each PCN filed with the bankruptcy court is signed with personal knowledge of the information contained in the filing. During the Relevant Period, this process was adhered to, and as such, there were no accuracy or robo-signing issues involved in any PCN filing.

<u>Identification of Untimely PCNs</u>

2.        Prior to the December 1, 2011 implementation date required by Bankruptcy Rule 3002.1, Wells Fargo made the decision to delay implementation of its PCN process until February, 2012 in order to fully test and validate its procedures for accurately preparing, signing, and filing PCNs. Following implementation, Wells Fargo identified several occurrences that would cause a monthly mortgage payment to change that had not been previously identified. The complexity of the loan product and certain circumstances, including the calculation of Daily Simple Interest, Lines of Credit and Loan Modifications, are examples of issues that resulted in Wells Fargo not meeting the 21-day notice requirement in Bankruptcy Rule 3002.1. Collectively, these issues resulted in Wells Fargo untimely filing or not filing PCNs as required by Bankruptcy Rule 3002.1.

3.        Wells Fargo identified approximately 84,480 Active Accounts for which a PCN was or should have been filed during the Relevant Period. Of these accounts, there were 54,837 Active Accounts for which a PCN was Untimely or Missed during the Relevant Period, and 42,756 of these had an increase in the payment associated with the Untimely or Missed PCN.

4.        Even for those approximately 54,837 Active Accounts where a PCN was Missed or Untimely, Wells Fargo mailed account statements to the account borrowers at least 10 days prior to the payment change that contained the correct monthly payment amount due. In addition, Wells Fargo represents that the borrowers on these accounts were sent timely and accurate RESPA and/or TILA notices that indicated their correct payment change.

**<u>ARTICLE IV</u>**

**<u>FACTS AS THEY RELATE TO ESCROW</u>**

Without waiving any privilege, Wells Fargo represents that the following facts are accurate to the best of its knowledge and belief:

5.        Wells Fargo utilizes MSP in connection with the preparation of Escrow Analyses for borrowers. Wells Fargo became aware of a technical issue with MSP in March, 2013, relating to storing Escrow Analyses for delinquent loans. As a result of this issue, during the Relevant Period through October, 2013, Wells Fargo did not always prepare annual Escrow Analyses within a 12-month timeframe. Specifically, MSP could only store 2 Escrow Analyses for an account at a time: the currently effective Escrow Analysis and the pending Escrow Analysis that would next go into effect. If a third Escrow Analysis was run, and the pending Escrow Analysis had not yet become effective, the newly generated third Escrow Analysis would overwrite the pending Escrow Analysis. Because of this technical limitation, Wells Fargo implemented a policy to delay Escrow Analyses when running an analysis that could lead to overwriting a pending Escrow Analysis.

4

6.     In November, 2013, changes were made to the MSP system to eliminate the overwriting of any pending Escrow Analyses.

7.     Following this system change, Wells Fargo began the process of performing annual Escrow Analyses that had not been completed within a 12-month timeframe.  This process began in December, 2013 and was completed on February, 2015.

8.     Wells Fargo identified approximately 18,538 instances of Untimely Escrow Analyses during the Relevant Period for borrowers with Active Accounts.

9.     During the Relevant Period, upon completing Escrow Analyses, Wells Fargo communicated to borrowers information related to any escrow shortage amount.

10.    The information communicated to the borrower contained an option to spread the escrow shortage over 12 months or pay the shortage in a lump sum.  Borrowers who paid the lump sum and also contacted Wells Fargo had their monthly payment amount adjusted.

11.    However, for the calendar year 2014 through June, 2015, Wells Fargo has identified approximately 2,400 customers with Active Accounts who made a lump sum escrow shortage payment during the Relevant Period but did not have their monthly payment amount automatically reduced consistent with the payment of the escrow shortage due to a system control, which automatically spread escrow shortages shown on the Escrow Analysis for customers in bankruptcy (the "Escrow Shortage Borrowers").

## ARTICLE V

## OPERATIONAL ENHANCEMENTS

12.    Wells Fargo has implemented, or will implement, a number of operational enhancements to ensure that all PCNs filed in Bankruptcy Cases going forward are Properly Filed PCNs.  Wells Fargo has or will enhance policies and procedures for the preparation, signing and filing of PCNs so that they make clear that, at minimum, a PCN is filed in bankruptcy court not less than 21 days before a payment in the new amount is due.  Included in these operational enhancements are the following items:

    a. A comprehensive training program for all PCN reviewers/signers, which includes three initial training sessions, annual refresher training, access to current policies and procedures for all team members, job aids, and tracking of team members' performance and completion of training sessions;

    b. A certification process for team members upon completion of a training program, which grants the team member authority to sign documents on behalf of Wells Fargo;

    c. A consistent, documented process for team members who serve as PCN reviewers/signers to follow, which ensures PCNs are properly completed and reviewed prior to signing and filing;

d.  A monitoring process to validate that team members who serve as PCN reviewers/signers have the proper authority and ECF accreditation to file documents in the various bankruptcy courts; and

e.  A control process to review the timeliness, quality, and accuracy of required PCNs, including the population requiring a PCN filing.  This process includes the following areas:

i.  Reviews of the timeliness, quality, and accuracy of PCNs through monthly sampling of the reviewers'/signers' work by random selection of PCN reviewers/signers by two different teams, including an internal quality assurance team and a compliance team, which does not report to mortgage servicing management;

ii.  Preparation of reports showing all future changes in the monthly payment amount for customers in bankruptcy, and reviews of the populations identified in those reports to ensure that PCNs were timely and properly filed; and

iii.  Reports from these different teams are delivered to senior management within the bankruptcy unit and mortgage servicing for review.

13.    For an account where an Untimely or Missed PCN has occurred on a payment increase, Wells Fargo's policy is to credit the account for the aggregate difference between the prior properly noticed payment amount and the payment amount associated with the Untimely or Missed PCN through the earlier of when: (a) a Properly Filed PCN is filed; (b) a Motion for Relief from Stay is filed; (c) the Bankruptcy Case is dismissed or converted; or (d) the borrower receives a discharge.  Wells Fargo's policy is to reconcile the borrower's account before a Motion for Relief from stay is filed and prior to releasing the account back to non-bankruptcy servicing after the Bankruptcy Case is dismissed or converted, or the borrower receives a discharge.

14.    As discussed, in November, 2013, changes were made to the MSP system to eliminate the overwriting of any pending Escrow Analyses.  Wells Fargo also implemented or revised its policies to ensure that Escrow Analyses would be run on a 12-month cycle.  In addition, Wells Fargo revised its policies to ensure that any customer in bankruptcy who paid their escrow shortage in a lump sum would have their monthly payment automatically reduced pursuant to the Escrow Analysis.

15.    Wells Fargo's operational enhancements described in this Article shall be implemented on or before November 30, 2015 (the "Operational Enhancement Date").

## **ARTICLE VI**

## **PCN AND ESCROW CORRECTIVE ACTION**

A.  <u>PCN Corrective Action</u>

16.    Wells Fargo has identified approximately 42,756 Active Accounts for which there were Untimely or Missed PCNs and the associated monthly payment increased on the account. Wells Fargo represents that the borrowers on these accounts received notices of the increase on account statements or in RESPA and/or TILA notices.  For these accounts in which there were Untimely or Missed PCNs and the payment increased, Wells Fargo has or will take the following corrective actions:

a.    For these approximately 42,756 Active Accounts, Wells Fargo will provide a credit (the "Payment Increase Credit") to each of these accounts as follows:

| Number of Impacted Accounts | Unpaid Principal Balance as of March 31, 2015 | Credit to Customer Account |
|---|---|---|
| 7,932 | Up to $74,999 | $708 |
| 14,373 | $75,000-$149,999 | $1,026 |
| 13,006 | $150,000-$299,999 | $1,313 |
| 7,099 | $300,000-$699,999 | $1,968 |
| 346 | $700,000 or more | $6,360 |

b.    In addition to providing the Payment Increase Credit, Wells Fargo shall also undertake an account reconciliation for the Active Accounts identified in Paragraph 16(a) when the earliest of one of the following events occurs: (1) Wells Fargo files a Motion for Relief from Stay; (2) the Bankruptcy Case is dismissed or converted; or (3) the debtor receives a discharge.  Upon undertaking the account reconciliation, Wells Fargo will credit those Active Accounts for: (1) the aggregate difference between the prior properly noticed payment amount and the payment amount associated with the Untimely or Missed PCN through the earlier of when a Properly Filed PCN is filed, a Motion for Relief from Stay is filed, the Bankruptcy Case is dismissed or converted, or the borrower receives a discharge (the "Reconciliation Amount"); (2) less the Payment Increase Credit and any other credits previously paid under Paragraph 16(c).  If the amount of the credit under Paragraph 16(a) is in excess of the Reconciliation Amount, the borrower shall not receive any additional credit and Wells Fargo shall not receive any refund; and

7

      c.     For approximately 8,000 Active Accounts and other accounts, which are no longer Active Accounts, Wells Fargo has previously credited the aggregate difference between the prior properly noticed payment amount and the payment amount associated with the Untimely or Missed PCN through the earlier of when: (1) a Properly Filed PCN was filed; (2) a Motion for Relief from Stay was filed; (3) the Bankruptcy Case was dismissed; or (4) the borrower received a discharge. The amount previously credited is approximately $3,000,000.00. However, any Active Account previously credited shall receive the credit described in Paragraph 16(a);

17.     Wells Fargo has identified approximately 3,000 Active Accounts for which: (a) there were Untimely or Missed PCNs; (b) the associated monthly payment decreased on the account; (c) the borrower or trustee paid more than the actual monthly payment amount due; and, (d) there was no prior or subsequent Untimely or Missed PCN for a payment increase. For those accounts, Wells Fargo will refund to the borrower or trustee, as appropriate, the aggregate amount paid in excess of the new actual monthly payment amount due through the earlier of when: (1) a Properly Filed PCN was filed; (2) a Motion for Relief from Stay was filed; (3) the Bankruptcy Case was dismissed or converted; or (4) the borrower received a discharge.

B.    <u>Escrow Corrective Action</u>

18.     Wells Fargo has identified approximately 18,538 Active Accounts that had one or more Escrow Analyses that exceeded the normal 12-month cycle (the "Delayed Escrow Cases"). In these cases, Wells Fargo will complete Escrow Analyses as if they had occurred at the 12-month mark (the "Pro Forma Analysis") and compare the Pro Forma Analyses to any other later prepared Escrow Analysis (the "Delayed Escrow Analysis"). If the Pro Forma Analysis shows:

      a.     a shortage less than the shortage shown in the Delayed Escrow Analysis, Wells Fargo will credit the escrow account for the difference between the Delayed Escrow Analysis shortage and the Pro Forma Analysis shortage; or

      b.     a surplus of $50 or more and the borrower is current under a confirmed plan in the Bankruptcy Case or current as of the conversion or dismissal of the Bankruptcy Case, Wells Fargo will refund the amount of the surplus to the borrower or trustee, as appropriate.

19.     In approximately 12,000 of the Delayed Escrow Cases, the borrower is not already included in the crediting population under Paragraph 16(a) and the escrow payment would have changed and a PCN would have been filed had the escrow analysis not been delayed (the "Delayed Escrow PCN Cases"). In each of the Delayed Escrow PCN Cases, Wells Fargo will credit the borrowers' account in the amount of $333.33.

20.     For the Escrow Shortage Borrowers, Wells Fargo will refund all amounts overpaid by the borrower or trustee on account of the monthly payment amount not having been decreased to reflect the lump sum payment of the escrow shortage by the Escrow Shortage Borrowers, and file a Properly Filed PCN, if necessary.

C.      General Corrective Action Obligations

21.      Wells Fargo shall: (a) send a written notice to all borrowers (and if the Bankruptcy Case is still active, the borrower's counsel and bankruptcy trustee) who receive a credit or refund as provided under Paragraphs 16 (a)-(b), and/or 17-20 informing them of the credit to their account or refund, and the reason for the credit or refund; and (b) will file a Properly Filed PCN if required in accordance with the Bankruptcy Rules.

22.      Wells Fargo confirms that, as a matter of practice, it does not impose post-petition late fees on borrowers in the course of a Bankruptcy Case (the "Late Fee Policy").

23.      Wells Fargo confirms that it has adhered to, and will continue to adhere to, the Late Fee Policy in any Bankruptcy Case in which Wells Fargo filed an Untimely PCN or failed to file a Missed PCN during the Relevant Period.  Wells Fargo further confirms that it has a policy not to impose additional fees, penalties, or charges on a borrower in a Bankruptcy Case as a result of an Untimely PCN or because there was an Missed PCN (collectively with the Late Fee Policy, the "PCN Policies").  Wells Fargo confirms that it has adhered during the Relevant Period, and will continue to adhere, to the PCN Policies in Bankruptcy Cases.  If it is determined that Wells Fargo did not adhere to the PCN Policies in any Bankruptcy Case, Wells Fargo will take appropriate corrective action and remediation, including crediting the borrower's mortgage loan account with all amounts assessed or imposed against the borrower in contravention of the PCN Policies or refunding all amounts improperly collected in contravention of the PCN Policies.

24.      In the event Wells Fargo previously resolved any objection to or adversary proceeding regarding a PCN, and the dispute was related to the timeliness of the PCN, Wells Fargo shall have no further obligation under this Order to pay any borrower or bankruptcy trustee on account of such PCN.

25.      In those cases in which an Untimely PCN was filed or where a Missed PCN was not filed during the Relevant Period, the Bankruptcy Case is still pending and the borrower or bankruptcy trustee has disputed a payment increase or fees, charges, and costs imposed in connection therewith at the time of execution of this Order, and the overall result is thereafter successful, Wells Fargo will reimburse the borrower for his or her reasonable attorneys' fees. Provided, however, that in order to identify such instances, Wells Fargo shall only be required to review any internally maintained list of bankruptcy matters and to request its outside bankruptcy counsel to bring any such cases to Wells Fargo's attention.  If a case that meets the criteria described in the first sentence of this paragraph is brought to Wells Fargo's attention by a borrower, trustee, the Independent Reviewer or the USTP, then Wells Fargo will also reimburse such borrower for his or her reasonable attorneys' fees.

26.      Wells Fargo shall complete all affirmative obligations in Paragraphs 16(a),  17-20 and 25 on or before November 30, 2016, (the "PCN and Escrow Corrective Action Date"), unless a later date is agreed to by the Parties in writing.

27.      Wells Fargo's obligations under Paragraphs 16(b) and 21 shall be completed as set forth herein.

**ARTICLE VII**

**INDEPENDENT REVIEW**

28.    The Parties have selected Lucy Morris as independent    reviewer (the "Independent Reviewer") with respect to this Order, subject to the provisions of this Article and a Retention Agreement and Work Plan to be negotiated between the Independent Reviewer and Wells Fargo as defined and described below.    The process for selecting the Independent Reviewer required that Wells Fargo submit three candidates to the USTP for selection.

29.    Wells Fargo will pay reasonable fees and costs arising out of the retention of the Independent Reviewer, including compensation and reimbursement of expenses to the Independent Reviewer and her professionals. If the Independent Reviewer is at any time unable to complete his or her duties under this Order, the parties shall mutually agree upon a replacement.

30.    The Independent Reviewer will be entitled to retain professionals with the qualifications, expertise, and skills appropriate for the tasks required under this Article.

31.    Any professionals retained by the Independent Reviewer shall not have been, within the two (2) years before the date of this Order, an equity security holder, director, officer, employee, or agent of Wells Fargo.

32.    The Independent Reviewer and her professionals will disclose to this Court any connections they have to Wells Fargo, its subsidiaries, directors, or officers in the manner provided under section 327(a) of the Bankruptcy Code and Bankruptcy Rule 2014.

33.    The Independent Reviewer must agree not to be retained by Wells Fargo for a period of two (2) years after the conclusion of the terms of this engagement, unless a shorter time period is agreed to by the Parties.

34.    Any professionals retained by the Independent Reviewer who work on the engagement must agree not to work on behalf of, or render services to, Wells Fargo for a period of one (1) year after the conclusion of the term of this engagement, unless the Parties consent to such retention, which consent shall not be unreasonably withheld.

35.    Any professional firm (including any law partnership or corporation or accounting partnership or corporation) retained by the Independent Reviewer must agree not to work on behalf of, or render services to, Wells Fargo related to Wells Fargo's servicing of residential mortgages for a period of one (1) year after the conclusion of the terms of this engagement, unless a shorter time period is agreed to by the Parties.

36.    It shall be the responsibility of the Independent Reviewer to undertake certain assessments as set forth in Paragraph 45 to determine whether Wells Fargo is in compliance with the corrective action obligations set forth in Article VI and other obligations set forth in this Order.

37.     Wells Fargo and the Independent Reviewer shall enter into a retention agreement providing for, among other things, payment of fees and costs, confidentiality, privacy of customers, methods for transmittal of information, and an end of contract method for dealing with work papers (the "Retention Agreement") to be agreed upon by Wells Fargo and the Independent Reviewer within 90 days from the later of the entry of this Order or the selection of the Independent Reviewer.

38.     The manner in which the Independent Reviewer will carry out her compliance responsibilities under this Order and, where applicable, the methodologies to be utilized shall be set forth in a work plan agreed upon by Wells Fargo and the Independent Reviewer (the "Work Plan") within 90 days from the later of the entry of this Order or the selection of the Independent Reviewer.  Wells Fargo or the Independent Reviewer shall provide to the EOUST a copy of the Work Plan once agreed to by Wells Fargo and the Independent Reviewer.

39.     The Retention Agreement and Work Plan entered into between the Independent Reviewer and Wells Fargo shall include terms protecting the confidentiality of information shared by Wells Fargo with the Independent Reviewer.  Nothing in this provision shall prevent the Independent Reviewer from providing USTP, orally or through written communication, with information concerning Wells Fargo's implementation and compliance with the terms of this Order.

40.     The Independent Reviewer may request access to other documents or information relevant to the scope of the assessments and reasonably necessary for the Independent Reviewer to fulfill her duties, including employee interviews and access to Wells Fargo's Executive Office bankruptcy related complaints.  Access to such documents and information shall not be unreasonably withheld by Wells Fargo.

41.     The Work Plan shall include a process whereby the accuracy and completeness of: (1) the identification of impacted borrowers, and (2) the provision of credits and/or refunds required in Paragraphs 16(a), 16(c), and 17-20 will be independently certified by a designated team within Wells Fargo Audit Services, which is the internal audit department of Wells Fargo. The designated team shall be independent of the line of business whose performance is being measured.  The Work Plan may also set forth that Wells Fargo Audit Services may perform additional work related to the assessments required under Paragraph 45 as agreed upon between the Independent Reviewer and Wells Fargo.  Wells Fargo Audit Services reports directly to the Chief Audit Officer, who reports directly to the Audit and Examination Committee of the Wells Fargo Board of Directors.  After completing its determination of the accuracy and completeness of:

      a.     the populations, Wells Fargo Audit Services will submit a certification to the Independent Reviewer and provide a copy to the EOUST prior to November 30, 2016, unless otherwise agreed to by the parties; and

      b.     the provision of credits and/or refunds required in Paragraphs 16(a), 16(c), and 17-20, Wells Fargo Audit Services will submit a certification to the Independent Reviewer and provide a copy to the EOUST on or before 60 days

following submission of final information to Wells Fargo Audit Services, but no later than November 30, 2016, unless agreed to by the Parties.

42.    The Work Plan will detail the process for how Wells Fargo Audit Services will provide the Independent Reviewer with work papers associated with its review. The Independent Reviewer and any professionals retained by the Independent Reviewer will be subject to appropriate confidentiality restrictions. The Independent Reviewer shall have access to the work papers, which shall include screen shots of Wells Fargo's systems of record, account records, and any other documents or information relevant to the scope of the assessments and reasonably necessary for the Independent Reviewer to fulfill her duties.

43.    The Work Plan and the Retention Agreement, as necessary, will specify the sampling methodology to be used in connection with the assessments set forth therein, and provide for a reasonable margin of error in any review of the sample of filings.

44.    Subject to appropriate confidentiality restrictions and without waiving Wells Fargo's right to invoke the attorney-client privilege, the work product doctrine and other privileges, Wells Fargo shall provide the Independent Reviewer with reasonable access to documents and records relevant to the operational enhancements implemented by Wells Fargo under this Order and reasonably necessary for the Independent Reviewer to complete the assessment under Paragraph 45(a).

45.    The Independent Reviewer's mandate shall be to assess only the following:

    a.    That Wells Fargo has implemented the Operational Enhancements described in Article V herein. The Independent Reviewer shall utilize a review methodology that is agreed upon between the Independent Reviewer and Wells Fargo in undertaking this assessment;

    b.    That Wells Fargo has implemented the account reconciliation and crediting processes required under Paragraph 16(b) and is complying with its affirmative obligations thereunder. The Independent Reviewer shall utilize a review methodology that is agreed upon between the Independent Reviewer and Wells Fargo in undertaking this assessment;

    c.    That each of the populations identified in Paragraphs 16(a) and 17-20 are substantially accurate by conducting a review of such accounts. The Independent Reviewer shall utilize a sampling methodology in undertaking this assessment;

    d.    That for each of the 42,756 Active Accounts described in Paragraph 16, Wells Fargo has credited each account consistent with the requirements of Paragraph 16 within the time required under this Order. The Independent Reviewer shall utilize a sampling methodology in undertaking this assessment;

    e.    That for each of the 18,538 Active Accounts described in Paragraph 18, Wells Fargo credited the borrower's account or refunded any surplus consistent with the requirement of Paragraph 18 within the time required under this Order.

The Independent Reviewer shall utilize a sampling methodology in undertaking this assessment;

f.  That for each of the Delayed Escrow Cases described in Paragraph 19, Wells Fargo credited the borrowers' account as required under Paragraph 19 within the time period required under this Order. The Independent Reviewer shall utilize a sampling methodology in undertaking this assessment;

g.  That for each of the Escrow Shortage Borrowers described in Paragraph 20, Wells Fargo refunded to the borrower or trustee the amounts required under Paragraph 20 within the time period required under this Order. The Independent Reviewer shall utilize a sampling methodology in undertaking this assessment;

h.  That for each of the Active Accounts described in Paragraph 17, Wells Fargo refunded the amounts required under Paragraph 17 within the time required under this Order.  The Independent Reviewer shall utilize a sampling methodology in undertaking this assessment;

i.  That Wells Fargo is complying with its affirmative obligations under Paragraph 23 through a review methodology that is agreed upon between the Independent Reviewer and Wells Fargo in undertaking this assessment;

j.  That Wells Fargo has fulfilled all affirmative requirements under Paragraph 25 within the time required under this Order.  The Independent Reviewer shall utilize a sampling methodology in undertaking this assessment;

k.  That, subsequent to the Relevant Period, Wells Fargo: (a) is timely performing and communicating Escrow Analyses for borrowers in Bankruptcy Cases, and (b) has filed Properly Filed PCNs in Bankruptcy Cases involving loan modifications    The Independent Reviewer shall utilize a sampling methodology in undertaking this assessment;

l.  That Wells Fargo is complying with the notice requirements set forth in Paragraph 21 through a review methodology that is agreed upon between the Independent Reviewer and Wells Fargo in undertaking the assessment; and

m.  That PCNs filed by Wells Fargo subsequent to the Relevant Period are filed consistent with the timing and notice requirements of Bankruptcy Rule 3002.1.  The Independent Reviewer shall utilize a review methodology that is agreed upon between the Independent Reviewer and Wells Fargo.

46.    The Independent Reviewer shall report on Wells Fargo's ongoing compliance with the terms of this Order on a semi-annual basis (the "Semi-Annual Reports") so long as this Order remains effective as set forth in Paragraph 65.  Prior to issuing any Semi-Annual Report, the Independent Reviewer shall provide a copy of the draft report to and consult with the Parties regarding her preliminary findings.  Wells Fargo may submit comments to the Independent Reviewer, which shall either be appended to or otherwise incorporated into the final version of

such report as appropriate in the Independent Reviewer's discretion, exercised reasonably. Within a reasonable time after the consultation, the Independent Reviewer shall finalize the Semi-Annual Report and provide copies to the EOUST and Wells Fargo. The Independent Reviewer shall file the Semi-Annual Report with this Court after having provided the EOUST and Wells Fargo with a copy.

47.    If delivery of a report of an assessment is required under Paragraphs 48-49, then the deadline for delivering the report shall be: (i) 180 days from delivery of the certifications in Paragraphs 41(a) and 41(b), or (ii) 180 days from November 30, 2016 for those assessments not subject to the certifications required under Paragraphs 41(a) and 41(b).

48.    With respect to the determinations in each of the Sub-paragraphs of Paragraph 45, if the Independent Reviewer's assessment concludes that Wells Fargo has met the standard or fulfilled the condition required by the sub-paragraph, then the Independent Reviewer will include this determination as a final assessment in her next scheduled Semi-Annual Report under paragraph 46; appointment of the Independent Reviewer with respect to that assessment shall terminate and the Independent Reviewer shall have no further duties with respect to such assessment and shall take no further action with respect to the subject matter of that assessment.

49.    With respect to the determinations in each of the Sub-Paragraphs of Paragraph 45, in the event the Independent Reviewer's assessment concludes that Wells Fargo has not yet met the standard or fulfilled the condition required by the assessment:

a.   The Independent Reviewer shall deliver to the Parties a report of her assessment in accordance with the time limits set forth in Paragraph 47. Wells Fargo shall have 30 days (which deadline may be extended by agreement in writing by the Independent Reviewer and Wells Fargo) to provide additional information to the Independent Reviewer or to object to the Independent Reviewer's assessment. The Independent Reviewer shall consider such information or objections in good faith. No later than 60 days (which deadline may be extended by agreement in writing by the Independent Reviewer and Wells Fargo) following the delivery of the assessment, the Independent Reviewer shall file her assessment with the Court; and

b.   Wells Fargo shall submit to the Independent Reviewer for her approval a corrective action plan and the appointment of the Independent Reviewer with respect to that particular sub-paragraph assessment shall continue. Once approved, Wells Fargo shall implement the corrective action plan within the time set forth therein and, provided the Independent Reviewer determines that Wells Fargo has fully and successfully implemented such corrective action plan, the Independent Reviewer shall file a final assessment that states that Wells Fargo has met the standard or satisfied the condition of the sub-paragraph at issue; appointment of the Independent Reviewer with respect to that assessment shall terminate and the Independent Reviewer shall have no further duties with respect to

14

such assessment and shall take no further action with respect to the subject matter of that assessment. In addition to implementing the corrective action plan, Wells Fargo will remediate any borrower harm caused by the failure to fulfill the sub-paragraph at issue.

50.     The Independent Review shall conclude when the Independent Reviewer has completed and filed a final assessment under either Paragraph 48 or 49 for each of the Sub-Paragraphs of Paragraph 45. After the conclusion of the Independent Review, the Independent Reviewer shall file a final Report setting forth the results of the Independent Review and disclosing her findings and conclusions. The final Report shall include a discussion of the Operational Enhancements implemented by Wells Fargo and their impact on Wells Fargo's ability to file Properly Filed PCNs. The final Report shall be filed within 90 days of the conclusion of the Independent Review under this paragraph. Except as otherwise provided in Paragraph 65, this Order shall remain in effect until the final Report is filed.

51.     Each of the time limits set forth in Paragraph 47 can be extended if agreed to in writing by the Parties.

52.     Either the Independent Reviewer or Wells Fargo may seek relief from the Court in the event that a dispute develops concerning the Independent Review that cannot be resolved through good faith negotiations between the Independent Reviewer and Wells Fargo.

## ARTICLE VIII

## RELEASE

53.     Upon becoming effective as set forth in Paragraph 65:

a.  The USTP consents and agrees to fully and finally release any claims, and will refrain from instituting, directing or maintaining any contested matter, adversary proceeding or participating in any contested matter or adversary proceeding by a third party (except that the United States Trustees may participate in an action to the extent ordered by a court provided that the United States Trustees may not seek such a court order formally or informally), against Wells Fargo pertaining to the Covered Conduct and arising out of or relating to Untimely PCNs, Missed PCNs, or Untimely Escrow Analyses.

b.  The USTP and Wells Fargo consent and agree to take such steps as may be reasonably necessary to fully and finally withdraw or facilitate the dismissal with prejudice of pending contested matters, adversary proceedings, and all related discovery requests, whether formal or informal, pertaining to the Covered Conduct and arising out of or relating to Untimely PCNs, Missed PCNs, or Untimely Escrow Analyses.

c.  Wells Fargo consents and agrees to fully and finally release the USTP and its current and former employees from claims under the Equal Access to Justice Act, 28 U.S.C. § 2412 based on the USTP's investigation and prosecution of claims pertaining to the Covered Conduct; and

d.  Notwithstanding the foregoing, nothing in this Paragraph shall be construed as a waiver of, or a restriction or prohibition on, the USTP's ability:

i.  In individual Bankruptcy Cases to seek corrective action and remediation (but not sanctions, fines or punitive damages) arising out of or related to the Covered Conduct where Wells Fargo fails to take corrective action or remediation required by this Order within the time frames established under this Order;

ii.  In individual Bankruptcy Cases to undertake any formal or informal action with respect to any: (1) PCN or (2) Escrow Analysis , except to the extent that a PCN or escrow related filing is untimely because it is part of the corrective action required by the terms of this Order and the filing is otherwise within the time frames established under this Order;

iii.  In individual Bankruptcy Cases to undertake any formal or informal action with respect to any filing by Wells Fargo in a Bankruptcy Case not based on the Covered Conduct;

iv.  To seek and obtain discovery in any Bankruptcy Case or proceeding, including discovery based on or pertaining to the Covered Conduct, as long as such discovery is not sought for the purpose of enforcing claims or causes of action released herein;

v.  To assert defenses or claims against any other party, and the USTP shall have no obligation to seek dismissal of any pending adversary proceedings, contested matters, appeals, and other actions filed by the USTP against any other party in matters pertaining to the Covered Conduct and arising out of or relating to Untimely PCNs, Missed PCNs, or Untimely Escrow Analyses; and

vi.  To cooperate with or provide assistance to other governmental agencies in connection with the Covered Conduct, or sharing information or discovery arising out of or pertaining to the Covered Conduct with other governmental agencies.

e.  The scope of the matters being resolved via this Order is limited to the Covered Conduct.  This Order does not settle, resolve, or prejudice any other rights or claims against Wells Fargo, including claims arising under the National Mortgage Settlement pertaining to matters other than Covered

16

Conduct. Notwithstanding any other provision of this Order claims with respect to any criminal liability are especially reserved and are not released.

## ARTICLE IX

## MISCELLANEOUS PROVISIONS

54.     The Court shall retain exclusive jurisdiction over all matters subject to this Order, including disputes arising under this Order, construction, interpretation, modification and enforcement of this Order, and shall retain exclusive jurisdiction to hear and adjudicate any motions related to this Order.

55.     This Order (and its contents) is not and shall not be used as an admission of liability, violation, or wrongdoing by Wells Fargo to any person or entity or on any legal or equitable theory. This Order is made without trial or adjudication of any issue of fact or law and does not contain any injunctive measures against Wells Fargo.

56.     This Order will not bind or prejudice the rights and claims of non-Parties. This Order binds Wells Fargo, and its respective corporate successors and assigns.

57.     This Order does not alter the Parties' rights, releases and obligations under the National Mortgage Settlement or any other settlements, agreements or orders to which Wells Fargo is a party.

58.     This Order does not prohibit Wells Fargo from making other or additional changes to the bankruptcy policies and procedures addressed in this Order, provided that such policies and procedures continue to comply with the Bankruptcy Code and Rules and are not otherwise inconsistent with the terms of this Order. If this Order provides that a notice will be sent to a borrower and such a notice has not already been mailed as of the effective date of this Order, then the USTP shall have the right to review the notice and approve the portion of the notice that references the reason for the notice, but this approval shall not be unreasonably withheld.

59.     In the event of a sale of the mortgage servicing rights for a loan subject to or covered by this Order, Wells Fargo shall either (a) fulfill its obligations under Article VI prior to transferring servicing of such loan, or (b) require that the transferee servicer provide the remediation specified in Paragraphs 16-20 for such loan. In the event that Wells Fargo transfers the mortgage servicing of any loan subject to or covered by this Order pursuant to regulatory requirement or directive, or investor requirement (including but not limited to Fannie Mae, Freddie Mac, Ginnie Mae, the Federal Housing Administration, the Department of Veterans Affairs or the Department of Agriculture), Wells Fargo shall use its best efforts to ensure that the new servicer cooperates in its efforts to effectuate the applicable relief set forth in Paragraphs 16-20; provided, however, that the USTP agrees and acknowledges that Wells Fargo cannot control the actions of any third party servicer with respect to such requests. As part of its best efforts, when contacted by a borrower impacted by a transfer of servicing, Wells Fargo shall direct the borrower to the appropriate contacts at the successor servicer with knowledge of Wells Fargo's request to honor the relief set forth above.

60.    This Order constitutes the entire agreement between the Parties relating to the subject matter reflected herein and may not be modified except in writing executed and delivered by the parties hereto. However, should Wells Fargo become engaged in a dispute, including an actual or threatened contested matter, adversary proceeding or other litigation with an individual borrower, then Wells Fargo shall have the discretion to provide different relief to such a borrower with his or her written consent and to take other customary litigation precautions.

61.    This Order may be executed by the Parties in one or more counterparts, or via facsimile or electronically scanned signatures, each of which shall be deemed an original, all of which together shall constitute one and the same instrument.

62.    In no event shall Wells Fargo be required to refund or credit, or take other actions as specified in Paragraphs 16-20 above to a borrower or trustee in a Bankruptcy Case if such refund or credit has previously been made to any such party in the case; e.g., Wells Fargo shall not be required to refund distributions or make a payment to the chapter 13 trustee if refunds or payments have already been made to the debtor, and vice-versa.

63.    The costs, fees and expenses of the Independent Reviewer and any of her professionals shall be actual and reasonable as applied to professional persons under 11 U.S.C. §§ 328 and 330.  Should Wells Fargo deem the costs, fees and expenses incurred by the Independent Reviewer or any of her professionals to be unreasonable, it shall be authorized to seek reduction or disallowance of such fees from this Court, and this Court shall apply the same standards for professional fees as is appropriate under 11 U.S.C. § 330.

64.    Wells Fargo shall in no event be required to provide any information hereunder to the USTP which shall constitute a violation of any federal or state law, including, but not limited to, privacy laws and the Truth In Lending Act, without an express order compelling such delivery by this Court.

65.    This Order shall become effective upon the running of any appeal period following its execution by the Parties and its entry by the Court.  Wells Fargo's obligations under this Order shall end as described in Paragraph 50, except as provided in Paragraphs 16(b) and 21, which shall terminate upon completion of the actions described therein.

66.    In the event the USTP determines that Wells Fargo is in violation of this Order, it shall provide notice of such violation to Wells Fargo and provide Wells Fargo 45 days to cure or otherwise purge the conduct deemed by the USTP to constitute the violation prior to the filing of any motion to enforce this Order in this Court, unless more time agreed to by the Parties.

67.    Wells Fargo recognizes that the USTP is entering into this Order in reliance on the material accuracy and material completeness of the factual representations set forth herein and that in the event of fraud or misrepresentation of material facts the USTP may seek relief from the final judgment in accordance with FRCP 60(b) and other authorities, subject to providing reasonable notice to Wells Fargo and opportunity for Wells Fargo to respond.

68.    If any time period in this Order is stated in days, the Parties and the Reviewer shall: (1) exclude the day of the event that triggers the period; and (2) count every subsequent day, including intermediate Saturdays, Sundays and legal holidays and include the last day of the

period, but if any time period set forth in this Order expires on a Saturday, Sunday or legal holiday, such time period shall continue to run until the end of the next day that is not a Saturday, Sunday or legal holiday.

69.    Any payments required to be made under this Order shall be deemed made when deposited in the United States mail, postage prepaid and addressed to the last known notice address for a loan.  Any payee's failure or refusal to accept such payment shall not be deemed a breach of Wells Fargo's obligations under this Order.  Upon written request, Wells Fargo shall reissue a check that the payee failed to timely negotiate provided that such request is received prior to March 31, 2016.

Seen and agreed to:

**WELLS FARGO BANK, N.A.**

  /s/ *Michael DeVito*
Michael DeVito, Executive Vice President
Wells Fargo Home Mortgage
Wells Fargo Bank, N.A.
One Home Campus – X2401-064
Des Moines, IA  50328

  /s/ *Soyong Cho*
Soyong Cho, Bar No. 17132
1601 K Street, NW
Washington, DC 20006
(202) 778-9000
soyong.cho@klgates.com

**EXECUTIVE OFFICE FOR UNITED STATES TRUSTEES**

  /s/ *Ramona D. Elliott*
Ramona D. Elliott, Deputy Director/General Counsel (Bar No. 05738)
Executive Office for United States Trustees
United States Department of Justice
441 G Street, NW
Suite 6150
Washington, DC  20530

**END OF ORDER**

# EXHIBIT A

| Issue | Approximate Number of Active Accounts | Corrective Action[3] | Total Approximate Credit or Refund |
|---|---|---|---|
| Untimely or Missed PCNs – Payment Increases - Lump Sum Payment | 42,756 | For any Active Account that had an increase in payment where Wells Fargo had an Untimely PCN or a Missed PCN, credit the account a lump-sum amount depending on the unpaid principal balance at the time of the credit.[4] | $53,600,000 |
| Untimely or Missed PCNs - Reconciliation Process | 42,756 | To the extent the lump-sum credit described above is less than the actual amount of the increase, credit any Active Account that had an increase in payment the actual amount of the increase in payment during the reconciliation process that occurs at discharge, conversion, dismissal, or stay relief where Wells Fargo had an Untimely PCN or a Missed PCN. | $10,000,000 |
| Untimely or Missed PCNs - Prior Remediation | 8,000 | Wells Fargo has previously credited the actual amount of the increase in payment where it had an Untimely or Missed PCN. | $3,000,000 |
| Untimely or Missed PCNs - Payment Decreases - Account Level Review | 3,000 | For any Active Account that had a decrease in payment where Wells Fargo had an Untimely PCN or a Missed PCN, refund the account the actual difference between the higher payment and the lower payment, which would have been reflected on the PCN. | $1,500,000 |
| Delayed Escrow Analysis Including an Untimely or Missed PCN | 6000 | Credit any borrower with an active account who, while they were in Ch.13 bankruptcy, had an escrow analysis performed outside of the normal 12 month cycle and had an increase in their shortage caused by the delay in the escrow analysis.  Wells Fargo will perform an escrow analysis as of the 12 month date and credit the account for any difference between the shortage at the time of the analysis and the shortage showing at the time the escrow analysis was actually performed. | $4,500,000 |
| Delayed Escrow Analysis Not Included in the Untimely or Missed PCN Population | 12000 | Credit the account $333.33 for any Active Account that had a Delayed Escrow Analysis and did not also have a corresponding Untimely or Missed PCN. | $4,000,000 |
| Unrefunded Escrow Surplus at Time of Annual Escrow Analysis | 6000 | Refund any Active Account that, while the borrower was in Ch.13 bankruptcy, had an escrow analysis performed outside of the normal 12 month cycle and following a pro forma escrow analysis that shows a surplus in excess of $50 and the surplus was not previously refunded or credited toward the next year's escrow payments. | $4,000,000 |
| Lump Sum Escrow Shortage Payment | 2400 | Refund any Active Account where the customer paid the amount of their escrow shortage identified in an annual escrow analysis but did not have their payment adjusted for the following year's payment amount. | $1,000,000 |
| | **Aggregate Approximate Number of Unique Impacted Accounts[5]** | | **Aggregate Approximate Credit or Refund** |
| | 67,800 | | $81,600,000 |

---

[3] These descriptions summarize proposed action, but language of the Order controls over this summary.
[4] This includes those PCNs that were treated as an increase regardless of the actual status of the PCN.
[5] The aggregate number of accounts is inclusive of all accounts impacted by this Order, and is not a sum of the accounts impacted in the individual issue categories.

1